**In re MAINE PRIDE SALMON, INC., Debtor.**

**Bankruptcy No. 93–10580.**

United States Bankruptcy Court, D. Maine.

April 17, 1995.

**338**

Curtis E. Kimball, Rudman & Winchell, Bangor, ME, for Moore–Clark Co. (Canada), Inc.

Joseph V. O'Donnell, Trustee, The Pilot Group, Portland, ME.

Andrew A. Cadot, Perkins, Thompson, Hinckley & Keddy, Portland, ME, for trustee.

Bruce F. Sleeper, Jensen, Baird, Gardner & Henry, Portland, ME, for Connors Aquaculture, Inc., and Connors Brunswick Warehousing, Inc.

John F. Logan III, Logan, Kurr & Hamilton, Bangor, ME, for Bar Harbor Banking & Trust.

Leonard M. Gulino, Preti, Flaherty, Beliveau & Pachios, Portland, ME, for Key Bank of Maine.

Gregory A. Tselikis, Bernstein, Shur, Sawyer & Nelson, Portland, ME, for Aldany Financial, Inc.

### MEMORANDUM OF DECISION

JAMES B. HAINES, Jr., Bankruptcy Judge.

### Introduction

Seven months after a Chapter 11 reorganization plan for Maine Pride Salmon, Inc., ("Maine Pride," "debtor" or "reorganized debtor") was confirmed, its case was converted to Chapter 7. Moore–Clark Co. (Canada), Inc., ("Moore–Clark") remains unpaid for goods supplied on credit to Maine Pride after confirmation, but before conversion. It has moved pursuant to § 506(c) to surcharge certain secured creditors' collateral to the extent of its claim.

The Moore–Clark motion squarely poses the following question: May a creditor who provided goods on (unsecured) credit to a reorganized entity between confirmation and conversion surcharge secured creditors whose collateral benefitted by use of the goods provided? For the reasons set forth below, I conclude that it cannot.[1]

### Background

1. *Maine Pride's Stormy Course.*

A sea of red ink brought Maine Pride Salmon, Inc., ("Maine Pride" or "debtor") an Eastport, Maine, aquaculture enterprise, to voluntary Chapter 11 bankruptcy on September 3, 1993. Maine Pride's ship came in when a group of investors, acting as Peacock Aquaculture Group ("PAG"), confirmed a plan of reorganization (the "PAG Plan") on May 2, 1994.[2]

Unfortunately, the PAG Plan proved unseaworthy. Unable to navigate the course it charted, PAG's plan began taking on water almost as soon as it sailed. Within months of confirmation, beset by storm tides and hungry seals, its crew of investors mutinied. Several jumped ship. On July 14, 1994, creditors filed motions seeking, *inter alia,* to compel PAG to fund the plan.[3]

---

1. This memorandum sets forth conclusions of law in accordance with Fed.R.Bankr.P. 7052 & 9014. I have made no factual findings, concluding, instead, that even if Moore–Clark could prove all the facts it asserts in support of its claim, its motion fails as a matter of law.

Unless indicated otherwise, all references to statutory sections are to the Bankruptcy Reform Act of 1978, as amended, 11 U.S.C. §§ 101, *et seq.,* (hereafter "Bankruptcy Code" or the "Code").

2. Order Confirming Third Amended Plan of Peacock Aquaculture Group, dated May 2, 1994, Court Doc. No. 142 (hereafter "Confirmation Order").

3. Motion of Connors Aquaculture, Inc., and Connors Brunswick Warehousing, Inc., for Contempt and to Require Implementation of Confirmed Chapter 11 Plan, filed July 14, 1994, Court Doc. No. 152. The Connors entities immediately were joined by Key Bank of Maine, Bar Harbor Banking & Trust and Aldany Financial, Inc. Together

In response, PAG admitted that it had not fulfilled its plan obligations and posited that the plan had not been "substantially consummated." *See* 11 U.S.C. § 1101(2). It explained that plan modifications were necessary, including a provision under which the reorganized debtor would "obtain feed on credit from Moore–Clark, with Moore–Clark being granted a first priority security interest in 1994 smolts...." [4]

I denied PAG's requests to shortcut postconfirmation modification procedures, *see* 11 U.S.C. § 1127(b), and, pending modification hearings, required it to fulfill its plan obligations to the extent it could. PAG was to file a comprehensive plan modification motion, accompanied by appropriate disclosures, to provide creditors with an opportunity to change their prior acceptances or rejections in light of the modifications and to bring the matter on for hearing.[5] *See* 11 U.S.C. § 1127(b), (c) & (d). After several delays, PAG cast off all efforts to modify the plan and abandoned ship.

Maine Pride was hard aground. Salvage efforts were futile. On December 16, 1994, after notice and hearing, and with the agreement of all parties-in-interest, the case converted to Chapter 7.[6] Joseph V. O'Donnell ("trustee" or "O'Donnell") assumed the helm as Chapter 7 trustee.[7] With § 721 operating authority and a cash collateral order, O'Donnell piloted Maine Pride's business toward a court-approved sale of, among other things, its inventory.[8]

### 2. *Funding for Fish Food: An Empty Net.*

Between September 1, 1994 (four months post-confirmation), and December 15, 1994 (one day pre-conversion), Moore–Clark fed the fish. It is owed $648,818.00 for feed supplied during that period.[9]

Moore–Clark proposes to prove that the feed it furnished was necessary to preserve Maine Pride's inventory of Atlantic salmon; that providing the feed ensured the fishes' continued growth and health; that it supplied feed on the order of Maine Pride or PAG's authorized agents; and that its charges were reasonable.[10]

### *Discussion*

Moore–Clark's motion invokes § 506(c) to assert priority ahead of secured creditors in sales proceeds of Maine Pride's inventory.

---

the movants and their supporters represented substantially all creditors holding secured rights to payment under the confirmed plan.

4. Response by Peacock Aquaculture Group to Motion for Contempt and to Require Implementation of Confirmed Chapter 11 Plan, filed August 12, 1994, Court Doc. No. 168. PAG explained that, although it had not been disclosed before confirmation, feed financing was "critical" to the plan's success. PAG represented that, although it knew it would need to finance feed to make its plan work, it was not until after confirmation that it learned that Moore–Clark (and presumably other feed suppliers) would insist on security to provide feed on credit. *Id.* at 5 n. 3.

5. Orders dated September 12, 1994 (Court Doc. Nos. 179, 180); Order dated October 4, 1994 (Court Doc. No. 185); Order dated November 15, 1994 (Court Doc. No. 197).

6. Order dated December 16, 1995 (Court Doc. No. 210) (hereafter "Conversion Order"). All parties also agreed that upon conversion all assets of the former Chapter 11 estate would vest in the Chapter 7 estate, regardless of where they rested preconversion under the terms of the confirmed plan. *See* Conversion Order at ¶ 2.

7. Certificate of Appointment of Interim Trustee, dated December 16, 1994 (Court Doc. No. 211).

8. Order Granting Trustee's Motion for Authority to Conduct Business, dated December 16, 1994 (Court Doc. No. 215); Orders Granting Trustee's Motion for Authority to Use Cash Collateral, dated December 19, 1994 (Court Doc. No. 216), December 23, 1994 (Court Doc. No. 216), January 25, 1995 (Court Doc. No. 223), and March 1, 1995 (Court Doc. No. 234); and Order Granting Trustee's Motion to Sell Assets Free and Clear and Approving Assumption and Assignment of Leases, dated March 23, 1995 (Court Doc. No. 266).

The court-approved sale, slated to close in stages, hasn't yet been completed.

9. Moore–Clark's offer of proof indicates that it supplied $648,818.00 worth of food and that it remains unpaid in that amount, leading to the conclusion that it received no payment whatsoever for food it delivered during the period in question. Whether the $648,818.00 is or is not "net of payments" makes no difference for purposes of today's discussion.

10. Moore–Clark Offer of Proof filed March 27, 1995 (Court Doc. No. 268).

Originally it asked for a "first priority lien on the debtor's fish inventory." In other submissions, Moore–Clark asks that funds sufficient to pay its $648,818.00 claim be set aside for it before the trustee distributes sale proceeds to creditors with claims secured by inventory.

Parties opposing Moore–Clark's motion, including the Chapter 7 trustee, point to procedural deficiencies in its requests.[11] Putting those concerns aside, however, there are compelling reasons why Moore–Clark can obtain no relief under § 506(c).

### 1. The Scope of § 506(c).

Section 506(c) provides that a trustee may recover expenses of preserving or disposing of property that collateralizes an allowed secured claim: "The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim."

Thus, notwithstanding the general rule that unsecured creditors assume the costs of administering the estate, § 506(c) provides a means by which a trustee may "surcharge" a secured creditor for expenses directly related to preservation or disposition of the creditor's collateral to the extent that the creditor benefits. In re Parque Forestal, Inc., 949 F.2d 504, 511 (1st Cir.1991) (citing In re Trim–X, Inc., 695 F.2d 296, 302 (7th Cir.1982)); In re Korupp Associates, Inc., 30 B.R. 659, 661–62 (Bankr.D.Me.1983). See generally 2 Queenan, Hendel & Hillinger, Chapter 11 Theory and Practice § 15.06 (1994) [hereinafter "Chapter 11 Theory and Practice"]; 2 Norton Bankruptcy Law and Practice 2d § 43:4 (1994).

Because § 506(c) applies in Chapter 11, § 103(a), it is available to a debtor-in-possession. § 1107(a). In this circuit, parties other than a trustee or a debtor-in-possession may invoke § 506(c) under certain circumstances. In re Parque Forestal, Inc.,

949 F.2d at 511–12. See also In re Palomar Truck Corp., 951 F.2d 229, 231–32 (9th Cir. 1991), cert. denied sub nom. General Electric Capital Corp. v. North County Jeep & Renault, Inc., —— U.S. ——, 113 S.Ct. 71, 121 L.Ed.2d 37 (1992); In re Delta Towers, Ltd., 924 F.2d 74, 75–76 (5th Cir.1991); In re McKeesport Steel Castings Co., 799 F.2d 91, 93–94 (3d Cir.1986). See generally 2 Chapter 11 Theory and Practice § 15.06 at 15:26 & n. 119.

The party invoking § 506(c) must establish (1) that the expenditure in question was necessary, (2) that the amount expended was reasonable, and (3) that the secured creditor benefitted. In re Parque Forestal, 949 F.2d at 512 (citing In re P.C., Ltd., 929 F.2d 203, 205 (5th Cir.1991)).

Section 506(c) provides a tool to assist in efficiently and equitably administering estate assets. See 3 King, Collier on Bankruptcy ¶ 506.06 at 506–55 (15th ed. 1995). The section's terms demonstrate its limited purpose. It gives the "trustee" the ability to seek a surcharge. The trustee referred to is plainly the individual or entity charged with administering estate assets. See § 323(a) ("trustee in a case under this title is the representative of the estate"), § 704 (Chapter 7 trustee duties), § 1106 (Chapter 11 trustee duties). After confirmation of a Chapter 11 plan, the duties of the "estate trustee" (as opposed to a "plan trustee" who may be appointed to perform designated functions by a plan's terms) are reduced from broad estate administration to merely "fil[ing] such reports as are necessary or as the court orders." § 1106(a)(7). After plan confirmation, the estate trustee (or the debtor-in-possession), as such, is unable to incur administrative expenses, including those that could arguably be surcharged to secured creditors. See In re Roy Gooden Plumbing & Sewer Co., Inc., 156 B.R. 635, 637–38 (Bankr.E.D.Mo.1993) (post-confirmation, pre-conversion expenses are not administrative).

---

11. For example, to the extent that Moore–Clark seeks to establish a lien, it must initiate an adversary proceeding. Fed.R.Bankr.P. 7001(2) (action to determine validity, priority or extent of lien), 7001(9) (action for declaration of rights). The

same can be said of its attempt to enjoin the trustee from distributing sales proceeds in accordance with this court's previously entered sale order. Fed.R.Bankr.P. 7001(7) (action to obtain injunction).

I will assume that Moore–Clark could be entitled to invoke § 506(c) on the facts of this case. And I will assume that it was necessary to feed the fish, that Moore–Clark's claim for feed sold is reasonable and that the feed benefitted creditors secured by Maine Pride's fish inventory by ensuring salmon survival and fostering fish growth. Even so, § 506(c) is of not of sufficient scope to shackle secured creditors with Moore–Clark's charges.

### 2. Why § 506(c) Won't Buoy Moore–Clark's Claim.

█ Because Moore–Clark extended credit to the reorganized debtor after plan confirmation, § 506(c) plays no part in ordering the priority of its claim vis-a-vis creditors with liens on Maine Pride's fish inventory under the PAG plan.

Disputes about surcharging post-confirmation claims have spawned only a few reported opinions, but a recent New Jersey case is instructive. In *Bezner v. United Jersey Bank (In re Midway, Inc.)*, 166 B.R. 585, 593 (Bankr.D.N.J.1994), a construction firm defaulted on its obligations under a confirmed Chapter 11 plan. Its case was subsequently converted to Chapter 7. The court considered a union's demand that a § 506(c) surcharge be imposed on the creditor whose claim was secured by the debtor's accounts receivables, contending that union members' post-confirmation, pre-conversion labor preserved or enhanced the accounts' value. In denying the request, the *Midway* court explained that § 506(c) is part of the Code's Chapter 5, which addresses "Creditors, the Debtor, and the Estate."

Chapter 5 addresses the creditors' and debtor's rights with respect to the estate. The confirmation of a plan, however, terminates the estate and revests estate property in the debtor under Code § 1141(b):

> Except as otherwise provided in the plan or the order confirming the plan, the confirmation of the plan vests all of the property of the estate in the debtor.

11 U.S.C. § 1141(b). Once the estate is terminated upon confirmation, creditors cannot ordinarily obtain administrative status for their claims because there is no estate to preserve. *In re Tri-L Corp.*, 65 B.R. 774, 777 (Bankr.D.Utah 1986). Claims arising in this period between confirmation and conversion are generally considered prepetition claims pursuant to Code § 348(d).

166 B.R. at 593–94.[12]

The Code's context confirms the accuracy of *Midway*'s observation. Chapter 5's Subchapter I, in which § 506(c) is found, addresses "Creditors and Claims" and establishes rules for filing proofs of claim (§ 501), for claims allowance (§ 502), for administrative expense status (§ 503), for determining tax claims (§ 505), for setting secured or unsecured status (§ 506), for distributional priorities (§ 507), and for other issues relating to conduct and treatment of claims and creditors. *See* § 504 (rules regarding sharing of administrative compensation), § 508 (effect of nonbankruptcy distributions on bankruptcy claims), § 509 (codebtor claims), and § 510 (subordination).

█ Subchapter I's provisions function to determine what, how much and when claims must be paid upon estate liquidation or in a reorganization plan.[13] Upon confirmation of

---

**12.** *In re P.C., Ltd.*, upon which Moore–Clark relies, is not persuasive precedent to the contrary. There, the Fifth Circuit assumed, without deciding, that post-confirmation expenses incurred in operating a hotel under a liquidating Chapter 11 plan might be considered "administrative expenses" chargeable to the secured creditor/plan proponent. Indeed, the court's comments in a footnote lend support to the conclusion upon which I base today's holding:

> Both parties assume that creditors of P.C. Ltd. whose debts arise post-confirmation but before French Market's sale of the hotel are entitled to be treated as holders of administra-

tive claims pursuant to § 503(b). We, too, assume without deciding that this is a correct proposition. We note, however, that such expenses would not seem to be "reasonable" or "necessary" to "preserve" the bankruptcy estate *after confirmation* unless special factors, such as an interim operation pending a sale, were specifically contemplated by the plan.

929 F.2d at 204 n. 1. *See In re Midway, Inc.*, 166 B.R. at 593–94 & n. 18 (distinguishing *In re P.C., Ltd.*).

**13.** *See, e.g.*, § 726 (Chapter 7 distribution referencing Chapter 5, Subchapter I provisions), § 1129(a)(9) (Chapter 11 distribution require-

a Chapter 11 plan Chapter 5's provisions have served their purpose: they have provided the rules determining "who gets what when." Thus, although § 506(c) does not expressly state that it ceases to operate at confirmation, its context, function and content demonstrate that it does.

Section 348(d) underlines this conclusion.[14] Generally speaking, it expressly addresses claims that arise after filing, but before conversion. By reference to § 1112 it necessarily comprehends claims arising after Chapter 11 plan confirmation, but before conversion to Chapter 7, because that section provides grounds for conversion including inability to "effectuate substantial consummation of a confirmed plan." § 1112(b)(7). Such claims are to be "treated for all purposes as if [they] had arisen immediately before the date of the filing of the petition." § 348(d). Since they are not administrative claims, they are not candidates for § 506(c) surcharge.

Finally, limiting § 506(c)'s operation to pre-confirmation expenses makes sense. A Chapter 11 debtor reorganizes with the aim of emerging from bankruptcy with a reformulated, feasible debt structure. Creditors may or may not choose to deal with the reorganized entity. Those who do deal with it are free to assess attendant risks and to strike their own deal, cognizant of constraints the confirmed plan imposes. If there's an opportunity to bargain for and obtain security, so be it. If there's no such opportunity, post-confirmation creditors extend unsecured credit at their own risk.

Maine Pride's case was converted to Chapter 7 over five months after the confirmation order entered. Even assuming that the plan had not been "substantially consummated" by then, although such a failure would leave the door open to plan modification, § 1127(a), it would not change the result under § 506(b). Plan modification must proceed pursuant to § 1127's dictates, which require "adequate information" (§§ 1127(c), 1125), notice (§ 1127(b)), an opportunity to change votes (§ 1127(d)), and a hearing at which the plan, as modified, must be confirmed. (§§ 1127(b), 1129). Although a plan proponent may seek to modify a confirmed plan after confirmation, it does not have the power to do so unilaterally. But permitting a § 506(c) surcharge for unpaid post-confirmation expenses would do just that. Parties holding rights as secured creditors under a confirmed plan would see their plan priorities diluted, the plan in essence "modified," without the procedural safeguards that § 1127 provides.[15]

PAG, in cooperation with Moore–Clark, attempted to modify the plan to obtain a lien to secure its credit advances. The attempt was met with substantial opposition. PAG aborted the modification motion. Maine Pride itself filed a post-confirmation § 506(c) motion at Moore–Clark's behest.[16] That motion was never brought on for hearing. Moore–Clark nevertheless continued to extend cred-

ments for § 507 claims), § 1129(b)(2) (Chapter 11 cram down treatment of allowed secured claims), § 1322(a)(2) (required Chapter 13 plan treatment of § 507 claims), § 1325(a) (required Chapter 13 treatment of allowed secured claims).

**14.** Section 348(d) provides as follows:

A claim against the estate or the debtor that arises after the order for relief but before conversion in a case that is converted under section 1112, 1208, or 1307 or this title, other than a claim specified in section 503(b) of this title, shall be treated for all purposes as if such claim had arisen immediately before the date of the filing of the petition.

Section 503(b) sets forth categories of administrative expenses, among which are "expenses of preserving the *estate.*" Maine Pride's post-confirmation expenses do not qualify as such. *See In re Midway,* 166 B.R. at 593–94 and text *infra,*

at nn. 16–17. *See also In re Tri–L Corp.,* 65 B.R. at 777–78.

**15.** In addition, the potential for imposing a § 506(c) surcharge could, if Moore–Clark's argument were accepted, persist throughout the reorganized debtor's execution of the plan, making secured creditors involuntary guarantors of the reorganized debtor's trade debt. That potential is at odds with the purposes underlying § 1127's provision that eliminates the ability to modify a confirmed plan once substantial consummation is achieved. *See 6 Chapter 11 Theory and Practice* § 32.20 at 32:43. *See also* Kendrick, *Postconfirmation Modification of the Plan of Reorganization: § 1127(b),* 5 Bankr.Dev.J. 211, 215 (1987).

**16.** Motion by Debtor for Order Granting Moore Clark Co. (Canada), Inc., First Priority Lien, filed December 1, 1994 (Court Doc. No. 202).

it, perhaps betting that things would work out in the end. I can only conclude that Moore–Clark voluntarily took a considered business risk—and lost.

█ Moore–Clark argues that the Chapter 11 estate survived confirmation because the entity that PAG proposed to create to receive the debtor's assets and continue its business was never created.[17] But, as *Midway* observed, under § 1141(b) confirmation vests all of the property of the estate in the debtor, unless the plan provides otherwise. 166 B.R. at 594. *See also, e.g., In re Pauling Auto Supply, Inc.,* 158 B.R. 789, 793 (Bankr. N.D.Iowa 1993) (estate "terminates" upon confirmation); *In re T.S.P. Industries, Inc.,* 117 B.R. 375, 377 (Bankr.N.D.Ill.1990) (upon confirmation estate property vests in debtor and estate ceases to exist unless plan provides otherwise); *In re Grinstead,* 75 B.R. 2, 3 (Bankr.D.Minn.1985) (same).

The PAG plan did not provide otherwise.[18] It did provide the proponent the option to structure an entity to carry on Maine Pride's business in any of several ways. But whether the new entity acquired Maine Pride's stock or its assets, whether it was a corporation or a partnership, the plan established that, as a first step, the estate's assets would vest in Maine Pride upon confirmation.[19] The Chapter 11 estate did not survive confirmation.[20]

### Conclusion

For these reasons, I conclude that Moore–Clark cannot anchor its post-confirmation

---

17. I reach no conclusion whether, under different circumstances, a Chapter 11 estate could, as such, survive confirmation or whether, if it did, § 506(c) would come into play.

18. The plan envisioned a straightforward reorganization with substantial capital infusions from new investors. It included no "special factors" that "specifically contemplate" post-confirmation continuation of the estate. *See In re P.C., Ltd.,* 929 F.2d at 204 n. 1, *quoted supra,* at n. 12.

19. PAG Third Amended Plan of Reorganization, filed March 25, 1994, (Court Doc. No. 116) at 52–53, 56–57, 60; Confirmation Order at 2–3.

20. Moore–Clark points to the Conversion Order's reference to "the Chapter 11 estate" as one entity, among several, that might hold assets that would, upon conversion, vest in the Chapter 7 estate. But that provision was not a determina-

---

claim on § 506(c). Under § 348(d), its claim must drift in the sea of unsecured claims surrounding the island of insolvency where Maine Pride lies marooned.

A separate order consistent with this opinion will enter forthwith.

---

tion that the Chapter 11 estate continued to exist. Rather, given the perishable and valuable nature of Maine Pride's fish stock, all parties agreed that the Conversion Order should sweep as broadly as possible to guarantee that all the debtor's pre-conversion assets (with exceptions not pertinent here) would vest in the Chapter 7 estate so that they might be preserved, administered and sold by the Chapter 7 trustee. *Cf. In re Pauling Auto Supply, Inc.,* 158 B.R. at 793; *In re T.S.P. Industries, Inc.,* 117 B.R. at 377 (case dismissed rather than converted because, after confirmation, there was no Chapter 11 estate, hence, no assets to be administered in Chapter 7). Thus, the order named every conceivable post-confirmation repository of Maine Pride's pre-confirmation estate as a source from which assets would flow to the Chapter 7 estate. Conversion Order at ¶ 2.