**In re RIVER CENTER HOLDINGS, LLC, River Center, LLC, and Rein, LP, Debtors.**

**No. 01–11004 (REG).**

United States Bankruptcy Court, S.D. New York.

Oct. 3, 2008.

ders of September 2 and 3, 2008; Comet Letter of September 16, 2008.)

Schulte Roth & Zabel LLP, by David M. Hillman, New York, NY, for Blackacre Bridge Capital LLC and SWH Funding Corp.

Cole, Schotz, Meisel, Forman & Leonard, P.A., by Laurence May, New York, NY, for Confirmed Debtors and Joseph Korff.

Dickstein, Shapiro LLP, by Victoria A. Kummer, New York, NY, Special Litigation Counsel.

Goldstein, Goldstein, Rikon & Gottlieb P.C., by M. Robert Goldstein, New York, NY, Special Condemnation Counsel.

## DECISION AND ORDER ON MOTION TO ENFORCE SETTLEMENT AGREEMENT AND DEBTOR PRINCIPAL PROMISES, AND CROSS–MOTION TO CHARGE SECURED LENDERS' COLLATERAL

ROBERT E. GERBER, Bankruptcy Judge.

In this contested matter in the jointly administered chapter 11 cases of reorganized debtors River Center Holdings, LLC, River Center, LLC, and Rein, LP (collectively, "River Center" or the "Debtors"), Blackacre Bridge Capital LLC and

SWH Funding Corp. (collectively, the "Lenders") move for entry of an order, pursuant to section 105(a) of the Bankruptcy Code, to enforce:

(a) a "Stipulation and Agreement Regarding Compromise and Settlement" which previously had been approved by the Court (with retention of jurisdiction to determine disputes related to it), and

(b) verbal statements by River Center's principal Joseph Korff, made on the record in open court, that arguably were binding promises to pay the litigation expenses incurred in connection with River Center's prosecution of a condemnation action relating to the Debtors' principal asset.

River Center and Korff oppose the Lenders' motion, and cross-move for an order:

(a) pursuant to section 506(c) of the Code, permitting River Center to recover from the property securing the Lenders' allowed claim (*i.e.*, to recover from the condemnation award proceeds-a process sometimes referred to colloquially as a "charge" or "surcharge" against the condemnation award) for the litigation expenses River Center's Condemnation Counsel incurred in prosecuting the Condemnation Action (each as defined below), and

(b) pursuant to section 509 of the Code, granting Korff a charge against the condemnation award as subrogee to the rights of Condemnation Counsel to the extent that such counsel have already been paid.

Finally, River Center's Condemnation Counsel seek to assert and enforce their attorney's charging liens against the proceeds of the condemnation award under New York Judiciary Law § 475.

For reasons set forth at greater length below, the Court rules:

(1)(a) The Settlement Agreement should be and will be enforced, to the extent it has not been enforced already;[1] but

(b) The Lenders, who were neither promisees nor identified third-party beneficiaries, lack the standing (except derivatively, for which they have not secured the necessary authority to proceed) to enforce any promises Korff made—which to the extent Korff made any, were to the Debtors. Additionally, the Lenders have failed to show that sufficiently definite and unequivocal promises were made to the end that the Court might award either damages or specific performance.

(2)(a) The Reorganized Debtors' cross-motion to charge the Lenders' collateral, under section 506(c) of the Code, is denied, and

(b) Korff's related cross-motion, under section 509 of the Code, to assert subrogation rights is denied; for each of River Center and Korff, any claims that otherwise could have been asserted under section 509 were released, and, apart from that, Korff does not qualify for relief under that section.

(3) Condemnation Counsel's requests to assert charging liens, under N.Y. Judiciary Law § 475, are granted. Equitable factors that are argued to deprive them of such rights provide insufficient reason to depart from the normal entitlements under that statute.

*Facts*

Prior to its bankruptcy filing on February 28, 2001, River Center owned real

---

**1.** By order dated June 3, 2008, the Court ordered that amounts assertedly due to Condemnation Counsel under their charging liens be escrowed pending further court order, and that the remainder be paid to the Lenders, subject to disgorgement if necessary.

property in Manhattan (the "Property") secured by the Lenders' mortgage. The mortgage was personally guarantied by Korff, who, as noted, was and is River Center's principal. In April 2001, the Dormitory Authority of the State of New York ("DASNY") took the Property by eminent domain, offering to pay approximately $82 million. River Center contended that the Property was worth much more—in fact, $227 million—and that River Center was thus entitled to an additional $145 million. A litigated proceeding that would fix River Center's entitlement in connection with the condemnation (the "Condemnation Action") was initiated in 2001, and has continued in New York state court since that time.

Early in these chapter 11 cases, the Court approved the retention of Dickstein Shapiro, LLP (the "Dickstein Firm") and Goldstein, Goldstein, Rikon & Gottlieb, P.C. (the "Goldstein Firm") to represent River Center in the Condemnation Action as special litigation counsel and special condemnation counsel (collectively, "Condemnation Counsel"), respectively. The Goldstein Firm, which specializes in condemnation matters, was retained under a contingent fee arrangement. At a chambers conference, the Court directed that M. Robert Goldstein, of the Goldstein Firm, was to be the "captain of the ship," and that the Lenders could participate in the Condemnation Action either under his direction or with his consent. Ultimately, the Lenders—who joined as a claimant in the Condemnation Action—did not directly participate in the Condemnation Action.

While River Center was litigating the Condemnation Action with DASNY in New York Supreme Court, the Debtors and Korff were litigating with the Lenders in this Court in several contested matters and adversary proceedings. In one of these, initiated by a motion dated October 23, 2001 (the "Conversion Motion"), the Lenders sought to convert River Center's chapter 11 case to chapter 7—arguing, among other things, that River Center was incurring continuing losses as a consequence of its inability to pay its professional fees in the bankruptcy case and the Condemnation Action.

The Court held an evidentiary hearing on the Conversion Motion on November 5, 2002, at which Korff testified. In the course of that hearing, Korff made a fair number of statements—some unconditional, and some conditional or premised on assumptions, projections, or qualifiers—as to his willingness and/or commitment to fund expenses of the Condemnation Action:

A. I have agreed to continue to fund the costs to be borne in litigating the condemnation and the other administrative expenses with the answers specified in the interrogatories, with the reservation of rights to charge back the senior creditors should there be an appropriate 5—forgive me, whatever that section is.[2]

* * *

Q. [A]t the conclusion of this case will there remain any unpaid administrative expenses?

A. No, unless the professionals agree to defer payment.[3]

* * *

Q. And if the Court were to deny your motion to surcharge the secured creditor on the 506(c), would that have any bearing on your agreement to continue to fund?

---

2. Hrg. Tr. at 19 (November 5, 2002).

3. *Id.* at 21.

A. No.[4]

* * *

A. ... To the extent that I made advances post filing, I would like to get it back if the Court allows. If the Court doesn't, it will stay in.[5]

* * *

Q. Is there an agreement to pay interest on these advances?

A. Whatever the Court will allow. Basically I'm going to bounce that back to the judge.[6]

* * *

Q. And you've agreed to continue to fund the administrative expense and professional fees through the conclusion of this case. Is that your testimony?

A. To the extent that the professionals that I've engaged do not agree to continue to work without being self-funded, I will fund them. Now, this is based on a projection of what these expenses may be. I have no difficulty in making that statement without qualification at this point in time unless of course you drastically accelerate what's going to happen in the rest of the case.[7]

* * *

Q. ... Are you prepared to continue to keep funding that [$60 to $70,000 per month in operating expenses, including professional fees] until this case is completed?

A. As I view the trial likely to take place in January [2003, the Court assumes], I would expect that this case with regard to—and we have the issue of confirmation, that by the end of next year [2003] hopefully, our plan will be confirmed, the trial will have been concluded and the state will have determined whether or not to take an appeal, and in that context I expect to continue to fund whatever administrative expenses are incurred by the Debtor, River Center.[8]

In argument after the conclusion of Korff's testimony, counsel for River Center commented on it. River Center's counsel noted, accurately:

And while Mr. Korff did testify, it's all very loose. Is he going to continue to fund these cases throughout, until the condemnation judgment is rendered? Well, maybe. It depends on what the number is.[9]

And a moment later, in a question that flowed, in part, from River Center Center's counsel's observations in that regard, the Court stated that "I don't quarrel with your points about the softness of some of Mr. Korff's testimony." [10]

Ultimately the Court denied the Conversion Motion. The Court noted in making that ruling that:

... Korff has funded the great bulk of the costs of administration of this case, which are almost entirely professional fees, and has stated his expectation that he will continue to do so. He has advanced the funds subject to a repayment obligation, but one which would be subordinated to unsecured creditors, to the

---

4. *Id.*

5. *Id.* at 27.

6. *Id.*

7. *Id.* at 28.

8. *Id.* at 34–35.

9. *Id.* at 73.

10. *Id.*

extent he could not charge the Lenders' collateral under section 506(c). His testimony got a little soft with respect to his expectations or commitments as to the long term, for periods after the [Condemnation Action] trial, but he satisfied me, and I so find, that he has committed to do so through the conclusion of the trial.[11]

The Court further found as facts, as relevant to the issue then before it, that "the estate [was] not suffering material continuing loss to, or diminution of, the estate at this time, especially since the need to litigate with DASNY is essential to a recovery for anybody." [12]

The Court approved a Settlement Agreement between the parties, effective March 13, 2005, that allowed River Center to emerge from chapter 11. Neal Barlia, a partner of the Dickstein Firm, participated in the mediation and negotiation of the Settlement Agreement on behalf of River Center and Mr. Korff. The Settlement Agreement fixed the Lenders' allowed secured claim at $46.5 million plus interest, and the Lenders agreed to River Center's use of their cash collateral to pay Counsel's costs and expenses in the Condemnation Action.

The Settlement Agreement provided, in Paragraph 4, that:

> ... River Center shall request in the Condemnation Case that any and all payments due from DASNY to River Center in the Condemnation Case shall be made payable directly to the Lenders.... Korff shall be obligated to cause

River Center to take all necessary and appropriate actions to ensure that all such payments ... received by River Center from DASNY in the Condemnation Case are timely paid over to the Lenders.[13]

However, while Korff was obligated to cause River Center to take actions to ensure that payments received from DASNY would be timely paid to the Lenders, there were no other provisions placing obligations on Korff personally, such as to make the payments for professional fees he had told the Court he would pay in connection with the Condemnation Action.

Significantly here, the Settlement Agreement attached and incorporated three separate general releases. As relevant here, they included a release by the Debtors and Korff of the Lenders. In the "Release of Lenders" (the "Release"),[14] the Debtors and Korff released the Lenders from:

> any and all claims, liabilities, demands, rights, obligations, damages, expenses, attorneys' fees and causes of action whatsoever whether based on contract, negligence, bad faith, willful, wanton or malicious conduct, or any other theory of law or equity, from the beginning of the world to the date of this Release, ... asserted or unasserted, liquidated or unliquidated, direct or indirect, foreseen or unforeseen, mature or unmatured, known or unknown, accrued or not accrued or contingent, which Releasors [the Debtors and Korff] have, had, or

---

11. *Id.* at 123.

12. *Id.* at 123–124. *See also id.* at 127. The Court there stated:

 [T]he Lenders contend that, presently, there is continuing loss to or diminution of the estate. However, I find the opposite to be true. The property is no longer being operated by the Debtors, and their principal

expenditure, the cost of litigating with DASNY, has been, and can be expected at all times material to this determination at least, paid for by Mr. Korff.

13. Settlement Agreement dated January 4, 2005, at 3–4.

14. Settlement Agreement Ex. A.

can, shall or may hereafter have against the Releasees [Lenders] ... including but not limited to any surcharge claims under 11 U.S.C. § 506(c).... [15]

After a lengthy trial, the court in the Condemnation Action ruled that the value of the Property was $97 million (the "Condemnation Award"). The Condemnation Award is or presently will be the subject of a pending appeal, but in its present amount it is insufficient to pay the Lenders. And neither the Debtors nor Korff have paid Condemnation Counsel all of the fees and expenses to which such counsel would be entitled under their retention agreements; a portion is outstanding to each firm. After interim rulings by the Court in connection with the Lenders' motion, available Condemnation Award proceeds have been paid to the Lenders (subject to disgorgement, if necessary), except for a portion in an amount sufficient to satisfy Condemnation Counsel's charging lien claims that was escrowed pending the Court's determination on this motion.

## *Discussion*

### *I.*

### *Enforcement of the Settlement Agreement and Korff's Statements*

Invoking section 105(a) of the Code,[16] the Lenders seek to enforce (a) the Settlement Agreement and (b) Korff's commitment to pay River Center's professional costs and expenses incurred in connection with the Condemnation Action. The first presents no significant issues; the second requires greater discussion.

### *A.*

### *Enforcement of the Settlement Agreement*

■ Although there are some significant limits to a bankruptcy court's ability to use section 105(a) of the Code (discussed in Section I(B) below), section 105(a) plainly may be used "to enforce and implement" earlier orders.[17] That is particularly so here, since the Court's earlier order provided that the Court "retains jurisdiction to hear, consider and determinate all disputes arising out of or related to the Settlement Agreement." The Court thus enforced the Settlement Agreement in its interim rulings on the Lenders' motion, discussed above, ordering payment to the Lenders of amounts due them under the Settlement Agreement. To the extent the Lenders need the Court's further assistance to enforce the Settlement Agreement, their request will be granted.

### *B.*

### *Specific Performance or Damages Based on Korff's Statements*

■ While section 105(a) may be used for, among other purposes, enforcing earlier orders of the Court and agreements approved by the Court—especially where the Court, by earlier order, retained jurisdiction to enforce them—a bankruptcy court cannot utilize section 105(a) to contravene other provisions of the Code, or to create substantive rights that are other-

---

**15.** *Id.*

**16.** Section 105(a) provides:
The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua

sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

**17.** *See, e.g., NWL Holdings, Inc. v. Eden Center, Inc.* (*In re Ames Dep't Stores*), 317 B.R. 260, 274 (Bankr.S.D.N.Y.2004).

wise unavailable under applicable law.[18]

■ Whether the Court can use section 105(a) to enforce an alleged promise made in court, but not in a contract, is debatable. The Lenders have not cited to the Court any case where such a promise was so enforced, and the Court is aware of none. But assuming that it can be done at all, it can be accomplished, in the Court's view, only in a proceeding initiated by the entity that was the promisee or entity to whom performance was due (or a third party beneficiary of such), with respect to a promise that was sufficiently clear and unequivocal. Here, with respect to the first issue, the Court finds the necessary standing to be lacking, and with respect to the second issue, the Court determines that the Lenders have failed to satisfy the Court that sufficiently unequivocal promises were made.[19]

*1. Standing*

■ Preliminarily, there is here a critical standing deficiency. By means of section 105(a), the Lenders are seeking, in substance, specific performance of the promise Korff made, or damages for his failure to follow through on it. But the beneficiary of the commitments Korff made was not the Lenders personally (who were never identified as promisees or third-party beneficiaries), but instead the estate—whose obligations Korff said he would bankroll, and as to which the Lenders would have no more than the indirect benefits that estate creditors normally do when estate assets available to satisfy their claims are augmented or protected. In most Circuits, including the Second Circuit, bankruptcy courts have the power to deputize official committees and individual creditors to bring legal actions to vindicate rights that belong to the estate.[20] But in the Second Circuit, that requires an *STN* order, which here was neither sought nor obtained.

■ Of course, the Lenders would still have standing, under section 1109(b)

---

**18.** *See Momentum Mfg. Corp. v. Employee Creditors Comm. (In re Momentum Mfg. Corp.),* 25 F.3d 1132, 1136 & n. 4 (2d Cir. 1994) ("It is well settled that bankruptcy courts are courts of equity, empowered to invoke equitable principles to achieve fairness and justice in the reorganization process.... We have repeatedly emphasized the importance of the bankruptcy court's equitable power." But "[t]his power is not unlimited. Thus, a bankruptcy court may not exercise this power in contravention of provisions of the Code"); *Findley v. Blinken (In re Joint Eastern & Southern Dist. Asbestos Litig.),* 982 F.2d 721, 751 (2d Cir.1992), *modified on reh'g,* 993 F.2d 7 (1993) ("[a] reorganization is assuredly governed by equitable considerations, but that guiding principle is not a license to courts to invent remedies that overstep statutory limitations"). *See also Schwartz v. Aquatic Development Group (In re Aquatic Development Group, Inc.),* 352 F.3d 671, 680 (2d Cir.2003) (Straub, J., concurring) ("[T]his Court has repeatedly cautioned that 105(a) 'does not "authorize the bankruptcy courts to create substantive rights that are

otherwise unavailable under applicable law, or constitute a roving commission to do equity" ' ") (quoting *In re Dairy Mart Convenience Stores, Inc.,* 351 F.3d 86, 92 (2d Cir.2003)); *In re Ames Dept. Stores, Inc.,* 306 B.R. 43, 58 (Bankr.S.D.N.Y.2004) (Gerber, J.) (citing those cases); *Tese–Milner v. Moon (In re Moon),* 385 B.R. 541, 551 & n. 25 (Bankr. S.D.N.Y.2008) (Gerber, J.) (same).

**19.** There could be an additional issue as to whether an award of specific performance or damages for failure to perform was anticipated by anyone at the time. Some or all of the parties might have assumed, instead, that if Korff failed to follow through on his statements, the Court would simply convert or dismiss the case, or appoint a chapter 11 trustee. In light of the Court's other determinations, it does not have to decide this last issue.

**20.** *See Unsecured Creditors Comm. of Debtor STN Enters., Inc. v. Noyes (In re STN Enters.),* 779 F.2d 901 (2d Cir.1985) ("*STN*").

of the Code,[21] to move for *case adminis-tration relief* if Korff failed to honor his promise. At various times, their rights might have included moving for the appointment of a chapter 11 trustee, dismissing the case, terminating exclusivity, or seeking to convert the case to chapter 7. But the right to appear and be heard under section 1109(b) does not confer ownership of causes of action that belong to the estate. In its well-known *Smart World* decision,[22] disapproving settlement on behalf of an estate by a creditors committee over the objection of the debtor-in possession, the Second Circuit endorsed analysis by this Court in one of its *Adelphia* decisions,[23] and by Judge Chin of the district court in the *Sunbeam* cases[24]— each of which had ruled that the right to be heard in an adversary proceeding under section 1109(b) "did 'not equate to ownership of the causes of action in question.'"[25] In the absence of an *STN* order, the *debtor-in-possession* is the estate's legal representative,[26] and others—whether official committees or individual creditors—do not have ownership of estate causes of action.

■ Significantly, the Circuit in *Smart World* expressly rejected the argument that section 105(a) could be used to provide a basis for conferring the power to address estate claims upon an entity other than the debtor-in-possession. Repeating many of the principles, and citing many of the cases, that the Court noted above,[27] the *Smart World* court held, in that connection:

> We hold that the bankruptcy court's power to act pursuant to § 105(a) does not provide an independent basis upon which to grant appellees standing. Section 1109(b), as we have explained, does not entitle appellees to take over Smart World's legal claims, and various other provisions of the Code assign to Smart World alone the role of legal representative of, and fiduciary to, the bankruptcy estate. These are statutory limitations that the bankruptcy court cannot overstep simply by invoking § 105(a).[28]

Faced with a failure, on Korff's part, to meet commitments he made when opposing conversion before, the Lenders would still have standing to move to convert this case. But since claims for non-performance of Korff's commitments belong to the Debtors and not the Lenders, the Lenders lack standing to seek specific performance or damages for Korff's inaction.

## 2. *Nature of the Statements Made*

■ Additionally, assuming, *arguendo*, that the Lenders would have the necessary standing to hold Korff to the commitments he made, the Court would nevertheless

---

**21.** Section 1109(b) provides:

A party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may raise and may appear and be heard on any issue in a case under this chapter.

**22.** *Smart World Technologies, LLC v. Juno Online Servs., Inc.* (*In re Smart World Technologies, LLC*), 423 F.3d 166 (2d Cir.2005).

**23.** *Adelphia Communications Corp. v. Rigas* (*In re Adelphia Communications Corp.*), 285 B.R. 848, 850 (Bankr.S.D.N.Y.2002).

**24.** *Official Comm. of Unsecured Creditors of Sunbeam Corp. v. Morgan Stanley & Co.* (*In re Sunbeam Corp.*), 287 B.R. 861, 862 (S.D.N.Y. 2003).

**25.** 423 F.3d at 182, quoting *Adelphia*, 285 B.R. at 851.

**26.** 423 F.3d at 183.

**27.** *See* n. 18 above.

**28.** 423 F.3d at 184.

have to conclude that the Lenders have failed to satisfy the Court that sufficiently unequivocal promises were made. While Korff's statements initially were unequivocal,[29] at other times he qualified them, with the result that, read as a whole, they were not wholly unequivocal, and were statements of expectation, not promise. In particular, his last two statements inserted qualifiers:

> A. To the extent that the professionals that I've engaged do not agree to continue to work without being self-funded, I will fund them. *Now, this is based on a projection of what these expenses may be.* I have no difficulty in making that statement without qualification at this point in time *unless of course you drastically accelerate what's going to happen in the rest of the case.*[30]

> * * *

> A. *As I view the trial likely to take place in January,* I would expect that this case with regard to—and we have the issue of confirmation, *that by the end of next year hopefully, our plan will be confirmed, the trial will have been concluded* and the state will have determined whether or not take an appeal, and *in that context I expect to continue to fund* whatever administrative expense are incurred by the Debtor, River Center.[31]

Korff preceded his remarks in those two instances by assumptions, which undercut the Court's ability to find unequivocal promises, and spoke in terms of anticipation, not promise. Korff's use of the words "I *expect* to continue to fund" cannot be viewed as equivalent to "I *will* fund," or "I *promise* to fund."

It was a recognition of these less-than-wholly-unequivocal statements, the Court believes, that led counsel for the Lenders to say (and for the Court to agree):[32]

> And while Mr. Korff did testify, it's all very loose. Is he going to continue to fund these cases throughout, until the condemnation judgment is rendered? Well, maybe. It depends on what the number is.[33]

In order to be binding, alleged promises must be sufficiently unequivocal, and cannot merely be predictions or statements of present intention. As noted in the *Restatement* in its discussion of "Illusory promises; mere statements of intention," "[e]ven if a present intention is manifested, the reservation of an option to change that intention means that there can be no promisee who is justified in an expectation of performance."[34]

Korff's statements at the time were sufficient for the Court to determine that it should not then convert the case, or appoint a trustee. But the Court's factual findings at the time[35] were made in the context of a determination as to what it should then do in the case—not in the context of enforcing, or determining whether it could or should enforce, an

---

29. *See* Korff's first five statements, quoted above, beginning at page 708.

30. Hrg. Tr. at 28 (emphasis added).

31. *Id.* at 34–35 (emphasis added).

32. *See* Hrg. Tr. at 73 ("I don't quarrel with your points about the softness of some of Mr. Korff's testimony.").

33. *Id.* at 73.

34. Restatement (Second) of Contracts § 2.

35. *See* Hrg. Tr. at 123 ("His testimony got a little bit soft with respect to his expectations or commitments for the long term, for periods after the [Condemnation Action] trial, but he satisfied me and I so find that he has committed to do so through the conclusion of the trial").

assertedly binding contractual commitment. As it happened, the Condemnation Action did not come to trial as early as Korff had assumed (or as the Court had assumed, based on Korff's assumptions), and the Condemnation Action apparently was more expensive to try. Faced with a failure on Korff's part to continue to fund under such circumstances, the Lenders could, if they wished, have once more moved to convert or dismiss, or to displace Korff with a trustee. But given Korff's less than unequivocal commitments, the Court cannot find a sufficiently concrete promise on his part to find a breach of promise, warranting specific performance or damages.

## II.

### Charging the Lenders' Collateral Under Sections 506(c) and 509

In their cross-motion, (a) the Debtors seek to charge the Lenders' collateral, under section 506(c) of the Code, for costs of prosecuting the Condemnation Action after the date of the Release, and (b) Korff[36] seeks to charge the Lenders' collateral, under common law and section 509 of the Code, as a subrogee of Condemnation Counsel's rights, for the entirety of the prosecution of the Condemnation Action. Both requests are denied. The Debtors and Korff released any claims either might otherwise have been able to assert, and

additionally, Korff cannot assert claims under section 509.

### A.

### Claims Under Section 506(c)

■ Section 506(c) of the Code provides:

> The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim.

Korff and River Center maintain that when they entered into the Settlement Agreement, they agreed to waive section 506(c) claims only up to the effective date of the Release, and that they did not agree to any prospective waivers. Thus, their argument continues, because the expenses of Condemnation Counsel's continued work in the Condemnation Action was not covered under the Release, they should be allowed to charge the Condemnation Award under section 506(c) for attorneys fees thereafter incurred. For at least two of the reasons the Lenders note in their response,[37] the Court cannot agree.

The language of the Release, which is attached and incorporated into the Settlement Agreement, is unambiguous. Korff and River Center agreed to release:

**36.** The original cross-motion filed by Korff and River Center asserted that "to the extent Mr. Korff or River Center have already paid, or will pay [the Dickstein and Goldstein firms], *they* are equitably subrogated under New York law" and entitled to claims under section 509 to the "property right" the Dickstein and Goldstein firms had in the Condemnation Award. (Cross Motion ¶ 23; emphasis added). The theory under which River Center might have such a right, for its own obligation (to pay its own counsel), was not articulated, and a contention that a debtor could assert subrogation rights with respect to its

own obligation would at least seemingly fly in the face of section 509's requirement that the one claiming the entitlement be "liable with the debtor" on the underlying obligation. In any event, in their supplemental briefs, Korff and River Center did not press the point, and argued solely for such rights as Korff might have.

**37.** In light of the disposition of this motion, the Court does not have to address the other two.

any and all claims, liabilities, demands, rights, obligations, damages, expenses, attorneys' fees and causes of action whatsoever whether based on contract, negligence, bad faith, willful, wanton or malicious conduct, or any other theory of law or equity, from the beginning of the world to the date of this Release, ... *asserted or unasserted, liquidated or unliquidated,* direct or indirect, foreseen or unforeseen, *mature or unmatured, known or unknown, accrued or not accrued or contingent,* which Releasors [the Debtors and Korff] have, had, or can, *shall or may hereafter have* against the Releasees [Lenders] ... *including but not limited to any surcharge claims under 11 U.S.C. § 506(c)....* [38]

Although Korff, on behalf of the Debtors, plainly reserved the Debtors' rights to seek one or more section 506(c) surcharges at the evidentiary hearing on November 5, 2002, he and the Debtors equally plainly released those rights in the subsequent Release, executed in March 2005. Section 506(c) claims were squarely addressed in the Release, which expressly covered any "surcharge claims under 11 U.S.C. § 506(c)"—claims that Korff announced his intention to pursue 2–1/2 years earlier, three times at the November 2002 hearing alone.

The Court cannot agree that the portion of those section 506(c) claims whose amount was not yet fixed was excluded from the release. The Debtors had the duty to pay their Condemnation Counsel's fees from the dates each of the Condemnation Counsel was retained to prosecute the Condemnation Action. Indeed, the Goldstein Firm was retained under a *contingent fee* arrangement, executed years earlier, obligating the Debtors to pay the Goldstein Firm the prescribed amount based on a recovery that would take place, if at all, in the future. And although the exact amount payable pursuant to the Debtors' duty became fixed only after the Settlement Agreement was entered into, the language of the Release covered, among other things, any known contingent claims at the time. The claims released under the Release included, among others, those that were "asserted or unasserted," "liquidated or unliquidated," "mature or unmatured," and "accrued or not accrued or contingent." Especially with respect to the Goldstein Firm (where an existing contract had created a future duty to pay the amount fixed therein), but ultimately for both counsel, these known obligations may have been "unasserted," "unliquidated," "unmatured" and/or "not accrued" or "contingent," but they were plainly covered under the Release.[39]

Similarly, in addition to its several references to the release of claims that were unmatured, not accrued, or contingent, the Release also expressly included claims which the Debtors or Korff "*may hereafter have*" against the Lenders. If the parties had intended to carve out from the broad language in the Release any section 506(c) claims that had not yet matured or accrued, or to exclude from the Release

---

**38.** Settlement Agreement, at Ex. A. (emphasis added).

**39.** The Lenders argue that the facts in *Rotberg v. Dodwell & Co.,* 152 F.2d 100 (2d Cir.1945), further support their position, and the Court agrees. In *Rotberg,* the Second Circuit rejected arguments, like those made here, that a release excluded contingent claims that would blossom, if at all, after the date of the release.

The court rejected a litigant's contention that no right of action to recover those rebates accrued until they were actually received, so that an earlier release could not have covered them. With the parties aware that the importer might obtain future rebates, the court found that the scope of the release included the contingent refund claims.

claims that the Debtors or Korff might hereafter have, they could have, and should have, used diametrically opposite language.[40]

 The Court also agrees with the Lenders' second point. The Supreme Court has made clear that only the trustee has the power, under the plain language of the Code, to assert a section 506(c) claim.[41] After the Debtors' reorganization plan was confirmed and became effective, the Debtor's estate was terminated; the Lenders were no longer secured creditors; and River Center was no longer the debtor-in-possession. And thereafter, the trustee—in this case, River Center, as the debtor-in-possession—could no longer obtain administrative status for its claims because there was no estate to preserve.[42] Thus, even if Korff and the Debtors had not released the Debtors' right to surcharge pursuant to section 506(c), such a right would not exist past the effective date of the Debtors' plan.

## B.

### Claims Under Section 509

 Additionally, Korff also asserts claims against the Lenders' collateral for subrogation under New York law, to be enforced under section 509 of the Code. Subject to exceptions not applicable here, section 509 of the Code provides:

> [A]n entity that is liable with the debtor on, or that has secured, a claim of a creditor against the debtor, and that pays such claim, is subrogated to the rights of such creditor to the extent of such payment.

However, these claims too were released. Additionally, given Korff's contention (and the Court's conclusion, as discussed in Part I(B)(2) above) that he did not become liable for payment of Condemnation Counsel's fees, he would not be able to assert a claim under section 509 even if he had not released it.

Preliminarily, the Court rules that when Korff and the Debtors entered into the Release, Korff released any claims he might have against the Lenders under section 509, just as the Debtors released them under section 506(c). *See* Part II(A) above. Indeed, the Lenders' contentions in favor of release are even stronger here, because here Korff is seeking payment for legal fees paid to Condemnation Counsel *even before* execution of the Release—

---

**40.** The Court is well aware that the Release precedes its release language with the clause "from the beginning of the world to the date of this Release." But the Court cannot regard that language as dispositive in light of the much more specific language that follows it, and, especially, the references to "may hereafter have," at least with respect to known obligations which were uncertain only in amount.

The Court also notes another point—its understanding at the time it approved the Settlement Agreement, and the related releases. The Court then noted:

> The releases are entirely appropriate. The expectation of a party to demand finality in exchange for a waiver of claims in excess of 20 million is fully to be expected, much less reasonable.

(*See* Tr. of Arg. of 5/22/08, at 21.) Though this is not, in the Court's view, dispositive, the Court notes that its construction now is in accord with its understanding at the time.

**41.** *See Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 120 S.Ct. 1942, 147 L.Ed.2d 1 (2000).

**42.** *See In re Maine Pride Salmon, Inc.*, 180 B.R. 337, 341 (Bankr.D.Me.1995); *see also Bezner v. United Jersey Bank (In re Midway, Inc.)*, 166 B.R. 585, 594 (Bankr.D.N.J.1994) ("the Code provisions regarding administration of the bankruptcy estate, including 506(c), are not applicable ... because there was no estate when the subject claims arose").

thereby ignoring the distinction for which the Debtors and Korff had argued, in the section 506(c) prong of their cross-motion, when contending that the Release should be construed to be limited to attorneys' fees incurred only up to the time of the Release's execution.

■ Additionally, even if Korff had not released any section 509 claims he might otherwise have, he would not qualify for a section 509 charge against the Lenders' collateral. Even assuming, without deciding, that Korff might have rights under New York law (and not just to assert subrogation but also to succeed to counsel's § 475 rights),[43] Korff would still have to meet the requirements of section 509. Under section 509's plain language, in order to have rights under that provision, one must be "an entity that *is liable with the debtor on,* or *that has secured,* a claim of a creditor against the debtor."

Perhaps not surprisingly, Korff has introduced no document or any other evidence showing that he was liable with the debtor on the duty to pay Condemnation Counsel's fees, or that he secured it, as surety, guarantor, or co-maker, or by granting a security interest in his own property.[44] And elsewhere on this motion, Korff *denied* that he was liable for Condemnation Counsel's legal fees—obviating his need to pay the unpaid portion—and the Court, as noted above, agreed with him in that respect. Korff cannot have it both ways.

Korff cannot recover under section 509 for each of the above reasons.

### *III.*

*Condemnation Counsel's Charging Liens*

Under Paragraph 4 of the Settlement Agreement—which the parties refer to as the "direct pay" provision—any monetary award obtained from DASNY in the Condemnation Action is to go directly to the Lenders. However, under New York Judiciary Law § 475:

[f]rom the commencement of an action, special or other proceeding in any court . . . the attorney who appears for a party has a lien on his client's cause of action, claim or counterclaim, which attaches to a verdict, report, determination, decision, judgment or final order in his client's favor, and the proceeds thereof in whatever hands they may come; and the lien cannot be affected by any settlement between the parties before or after judgment, final order or determination.[45]

■ Under New York state law, an attorney's charging lien is presumptively valid, and:

does not merely give an attorney an enforceable right against the property of another, it gives the attorney an equitable ownership interest in the client's cause of action. . . . Manifestly, then, an attorney's charging lien . . . 'is a vested property right created by law and not a priority of payment.'[46]

---

**43.** This is doubtful, at least with respect to fees already paid to Condemnation Counsel. To the extent Condemnation Counsel were paid, the Court cannot see how they (and hence any subrogee) could assert a § 475 lien.

**44.** *Compare* 4 COLLIER ON BANKRUPTCY ¶¶ 509.01, 509.02[2], 509.03[5] (15th Ed. Rev.) (describing instances in which subrogation under section 509 *would* be appropriate).

**45.** N.Y. JUD LAW § 475 (McKinney 2005).

**46.** *LMWT Realty Corp. v. Davis Agency, Inc.,* 85 N.Y.2d 462, 467–468, 626 N.Y.S.2d 39, 649 N.E.2d 1183 (1995) (quoting *In re Washington Square Slum Clearance,* 5 N.Y.2d 300, 306, 184 N.Y.S.2d 585, 157 N.E.2d 587 (1959), *cert. denied,* 363 U.S. 841, 80 S.Ct. 1606, 4 L.Ed.2d 1726 (1960)).

Thus, the client's property right in his cause of action is what remains after transfer to the attorney of the agreed-upon share.[47] As a result, to the extent that the charging lien requests are valid, the Condemnation Counsel's property rights result in a lesser amount available for delivery to the Lenders, as contrasted to a lien that might otherwise be junior to the Lenders' liens.

■ But in determining whether to give an attorney's charging lien priority over another party's rights to the proceeds of a judgment, a court can take into account equitable considerations, the most significant of which are whether the attorney's services created the funds at issue and the extent to which allowing another party to recover the entire fund created by the attorney's efforts would be inequitable.[48] The Court thus must consider the equitable considerations supporting application of the normal rule, and supporting any departure from it.

■ Here Condemnation Counsel's efforts resulted in incremental increases in the funds at issue. Part of the fund that the estate ultimately received was offered by DASNY before the Condemnation Action trial, but the efforts of condemnation trial resulted in a larger award, albeit not as high as many allied with the Estate in the Condemnation Action hoped. An appeal could result in a greater recovery, but without the efforts to date, no appeal would be possible. And allowing the Lenders to secure the entire fund, without an offset for compensation for the counsel to secure it, would, in the absence of other compelling equities, be unfair. That is particularly so since the Lenders could have appeared themselves in the Condemnation Action, if they were of a mind to do so and pay the resulting expenses, but ultimately did not participate in any significant way.[49]

These facts are more than sufficient to bring Condemnation Counsel within the general rule that they should be allowed their charging liens, unless other equities trump those concerns. The Court here finds that potentially applicable other equitable considerations are insufficient to depart from the general rule.

Here none of the Debtors nor the Lenders is a knave, obviating the need to protect counsel from such a risk,[50] but one or the other of the Debtors or the Lenders would without the statutory protection be securing benefits provided by Condemnation Counsel without payment. Facts of the type that led to exceptions from the general rule—*e.g.*, set-offs from the same transaction, where there were no funds remaining from the judgment proceeds af-

---

47. *Estate of Dresner v. State*, 242 A.D.2d 627, 627, 662 N.Y.S.2d 780, 781 (2d Dep't 1997), *app. dismissed*, 91 N.Y.2d 1001, 676 N.Y.S.2d 125, 698 N.E.2d 954 (1998).

48. *See LMWT*, 85 N.Y.2d at 468–469, 626 N.Y.S.2d 39, 649 N.E.2d 1183.

49. There was some finger-pointing as between the parties concerning the extent to which any acts of the Debtors bore on the level of Lender participation, but ultimately the Court sees no evidence that any legal services provided by the Lenders had any material, if any, effect on the ultimate size of the condemnation award.

50. *Compare Banque Indosuez v. Sopwith Holdings Corp.*, 98 N.Y.2d 34, 38, 745 N.Y.S.2d 754, 772 N.E.2d 1112 (2002) (noting that charging liens existed under common law before the enactment of § 475 and its predecessor as "a device invented by the courts for the protection of attorneys against the knavery of their clients, by disabling clients from receiving the fruits of their recoveries without paying for the valuable services by which the recoveries were obtained."), *quoting Goodrich v. McDonald*, 67 Sickels 157, 163, 112 N.Y. 157, 19 N.E. 649 (1889).

ter set-off to which the charging lien could attach;[51] a "peculiar confluence of events and participants" where counsel and client sought to get around obligations to the client's wife;[52] or where claimant's counsel asked the holder of a senior tax lien to defer receipt of payments to which it would have been entitled before the charging lien was in place[53]—are not present here. Equitable considerations that the Lenders argue to be equivalent—that at the time of their retention, Condemnation Counsel knew that the Property was encumbered by the Lenders' mortgage; that Neal Barlia (a partner at the Dickstein Firm) negotiated the Settlement Agreement on behalf of River Center and Mr. Korff; and that Condemnation Counsel knew that the Settlement Agreement included a "direct pay" provision and did not object to it—do not rise to the level of "unclean hands" or meaningful distinctions in equity, and are in this Court's view insufficient to deny the charging lien.

With that said, the Court fully recognizes that the practical effect of this ruling is to tag the Lenders with the economic burden of Condemnation Counsel's unpaid fees—rather than Korff, who told this Court, though he did not unconditionally promise, that he would pay them. And the Court cannot rule out the possibility that this scenario was not inadvertent, from the perspective of either Korff or Condemnation Counsel. If a sufficient showing had been made that the effort to stick the Lenders with Condemnation Counsel's fees had been with the knowing cooperation of Condemnation Counsel, such would be an equitable factor strongly weighing against

enforcement of Condemnation Counsel's § 475 charging lien, and the Court likely would reach the opposite result. But ultimately—in the absence of evidence of counsel's complicity in creating the scenario before the Court, or that tagging the Lenders was the purpose, and not just the effect—the Court cannot find the practical effect alone to be sufficient to penalize Condemnation Counsel, and to override the general rule.

Accordingly, the Court will permit Condemnation Counsel to assert their charging liens against the proceeds of the Condemnation Action, in accordance with the general rule.

### Conclusion

For the foregoing reasons, the Lenders' motion seeking enforcement of the Settlement Agreement is granted, but their effort to secure specific performance or damages for Korff's failures to fund in accordance with his statements in court is denied. The Debtors' cross-motion to charge the Lenders' collateral, under section 506(c) of the Code, is denied, as is Korff's cross-motion to charge the Lenders' collateral under section 509. Condemnation Counsel's request to enforce their § 475 liens is granted.

SO ORDERED.

---

**51.** See Banque Indosuez, 98 N.Y.2d at 43, 745 N.Y.S.2d 754, 772 N.E.2d 1112.

**52.** See Daley v. Daley, 230 A.D.2d 182, 657 N.Y.S.2d 175 (1st Dep't 1997).

**53.** See In re City of New York, 9 Misc.3d 896, 804 N.Y.S.2d 612 (Sup.Ct. Kings Co.2005), aff'd sub nom. In re Mill Creek Phase 1 Staten Island Bluebelt Sys., 38 A.D.3d 665, 831 N.Y.S.2d 532 (2d Dep't 2007), rev'd on other grounds, 10 N.Y.3d 898, 891 N.E.2d 721, 861 N.Y.S.2d 605 (2008).